## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

MARIE JOHNSON,

          Plaintiff,

v.

          **MEMORANDUM OF LAW & ORDER**
          Civil File No. 12-443 (MJD/AJB)

THE CITY OF BLAINE,

          Defendant.

---

Bryce M. Miller, Schaefer Law Firm, LLC, Counsel for Plaintiff.

Jana M. O'Leary Sullivan and Patricia Y. Beety, League of Minnesota Cities, Counsel for Defendant.

---

## I.      INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment.  [Docket No. 11]  The Court heard oral argument on May 24, 2013. For the reasons that follow, the Court grants Defendant's motion for summary judgment.

## II.     BACKGROUND

### A.      Factual Background

### 1.    The Parties

Plaintiff Marie Johnson was hired as a patrol officer by the Defendant City

of Blaine's ("City") Police Department in July of 1993.  (Ex. 1, Johnson Dep. 31–

32.)  In 2004, Plaintiff was assigned the position of provisional detective and was

later promoted to the position of permanent Detective.  (Id. at 34–35.)  Plaintiff

earned a Bachelor of Science degree in Law Enforcement in 2001 and a Master's

Degree in Police Leadership, Administration, and Education in 2003.  (Ex. 157.)

From 1993 to approximately 1999 the Plaintiff generally performed her job

satisfactorily.  (Def. Mem. in Supp. of Mot. for Summ. J. at 3.)  During her

employment with the City of Blaine, Plaintiff was represented by the Law

Enforcement Labor Services union ("LELS").  (Johnson Dep. 31.)

### 2.    Plaintiff's Employment from 1999 to 2001

On February 5, 1999, Plaintiff was the primary responding officer on a fatal

pedestrian accident in which a 14-year-old boy died.  (Ex. 8.)  A few days later,

Plaintiff responded to a second fatal pedestrian accident on the same highway.

(Id.)  After responding to these fatalities, Johnson experienced symptoms of post-

traumatic stress disorder (PTSD) and depression.  (Exs. 10, 19.)  She took a short

leave of absence.  (Exs. 8-9)

In April of 2000, Plaintiff responded to a homicide. (Johnson Dep. 89–99, 108–10, 114–16; Ex. 23.)  Plaintiff, along with another patrol officer, administered first aid, but the victim died at the scene.  (Id.)  After she was left alone with the body, her PTSD was triggered, she had a breakdown at the scene, was unable to perform her job duties, and had to be driven back to the police station by another officer.  (Id.)  This incident triggered symptoms of PTSD and depression, causing Plaintiff to take an extended leave of absence.  (Exs. 23–37.)  In June 2000, she was hospitalized for suicide ideation.  (Johnson Dep. 98; Ex. 23.)  Johnson transitioned back to a full-duty police officer in January of 2001.  (Johnson Dep. 102-03, 118; Exs. 37-38.)

In June 2001, Plaintiff's supervisors observed signs that Plaintiff again experienced symptoms of PTSD and depression, such as Plaintiff's tearful statement on the firing range that she had recent feelings of self-harm.  (Exs. 42–43, 44.)  Pursuant to the "Reentry Agreement" completed at the end of Plaintiff's leave in January of 2001, the City of Blaine placed Plaintiff on "leave of absence" status on June 15, 2001.  (Ex. 42.)  Plaintiff returned from leave on June 26, 2001. (Ex. 43.)

3

On July 15, 2001, Johnson was issued a written reprimand for her conduct on June 1, 2001.  (Ex. 45.)  On that date, Plaintiff drove her patrol vehicle over a concrete curb and sidewalk, up a steep incline, and through a residential backyard while in pursuit of two juvenile suspects for misdemeanor theft.  (Id.)

### 3.    Plaintiff's Employment 2001 to 2006

From approximately July of 2001 to 2006, Plaintiff did not exhibit any significant symptoms of depression or PTSD.  (Johnson Dep. 130; Ex. 65.)  In 2004 the City assigned Plaintiff to the position of provisional detective, and, in April 2006, the City promoted Plaintiff to permanent detective.  (Johnson Dep. 34-35, 138–39.)

### 4.    Plaintiff's Employment from 2006 to 2009

#### a)    2007 Leave and Return to Work

In late 2006 and early 2007, Johnson was confronted with several deaths within a short period of time.  (Ex. 65.)  In August of 2006, Plaintiff's coworker committed suicide.  (Id.; Johnson Dep. 135–36.)  Plaintiff expressed that she had planned to shoot herself the way that he did and was angry that he had "stolen her thunder."  (Ex. 65 at 3.)  In early 2007, one of Plaintiff's friends died suddenly, and the mother of a different friend died.  (Id.)  Plaintiff's father died

4

in April 2007.  (Id. at 2-3; Johnson Dep. 136.)  She was also experiencing problems

in her marriage at this time.  (Ex. 65 at 3-4.)

In August of 2007, Johnson was hospitalized with symptoms of depression

and suicidal ideation.  (Johnson Dep. 161; Exs. 5, 49.)  On August 13, 2007,

Plaintiff requested Family and Medical Leave Act ("FMLA") leave until

September 15, 2007; however, Plaintiff did not know how long her mental health

condition would last.  (Ex. 49.)  She was hospitalized intermittently between

August 12, 2007, and October 13, 2007.  (Ex. 5.)

On October 16, 2007, the Human Resources Director for the City of Blaine

wrote to Plaintiff notifying her that her FMLA leave would expire on October 22,

2007.  (Ex. 50.)  Plaintiff responded by sending a memorandum to Robert

Therres, the Blaine City Manager, stating that she was unable to return to work

on October 23, 2007.  (Ex. 52.)  Further, Plaintiff stated that she hoped to return to

work by January 2008.  (Id.)  Plaintiff's memorandum was based on the

recommendation of her psychologist, Dr. Kristin Kunzman, who opined that

Plaintiff would be able to return to work in January 2008.  (Ex. 51.)

In response to Johnson's request for a leave of absence until January 2008,

Therres stated, in an October 26, 2007 letter:

> I have discussed [your leave of absence request] with Chief Johnson, his command officers, and Human Resources Director Terry Dussault.  Under the current staffing and personnel conditions present in the Police Department, approving a leave of absence of this length of time and for an undetermined period of time is not possible or appropriate.  I am willing to approve a leave of absence up to and no later than Monday, December 3, 2007. . . .

> Finally, prior to your return from "Leave of Absence" status you are required to provide the employer a letter from your doctor that clearly states you are able to return to work and assume the full responsibilities and duties of the position of Police Detective and Police Officer for the City of Blaine with no restrictions or conditions.  Additionally, you will be required to submit to a "Readiness for Duty" examination.  . . .

(Ex. 53.)

In response to Therres' letter, Plaintiff requested that Defendant schedule the "Readiness for Duty" examination and requested a return date of December 10, 2007 rather than December 3, 2007.  (Ex. 54.)  Plaintiff made this request, for extended unpaid leave, because she had registered and paid for a retreat from December 2 to December 7.  The retreat was intended to help public service workers overcome issues with PTSD, depression, and anxiety.  (Id.)

On November 3, 2007, Kunzman wrote a letter to Therres laying out an incremental plan for Johnson's gradual transition back to full time employment. (Ex. 56.)  In that letter, Kunzman also requested that Plaintiff be allowed to

return the week of December 10, 2007, so that Plaintiff could attend the retreat during the first week in December.  (Id.)  Finally, Kunzman stated that "[f[ull time active duty before Christmas just does not seem feasible. . . .  I think this holiday will be very difficult because of [Plaintiff's father's] death and her recent separation."  (Id.)

In response to Plaintiff's and Kunzman's requests, Therres responded with a November 16, 2007 letter stating, "The requirements for your return to Police Detective for the Blaine Police Department were detailed in my letter to you dated October 26, 2007 and they remain unchanged."  (Ex. 57.)  Therres went on to repeat the requirements set forth in his previous letter.  (Id.)  Specifically, a "leave of absence" had been approved until December 3, 2007; Plaintiff was required to submit a letter from her doctor stating that Plaintiff was clear to return to work with no restrictions or conditions; and Plaintiff was required to submit to a "Readiness for Duty" examination that would be scheduled once Defendant received the letter from Plaintiff's doctor.  (Id.)

On November 27, Kunzman issued a return-to-work authorization allowing Johnson to return to work as a detective without limitations on December 3, 2007, although that recommendation appeared to be based on

Kunzman's assumption that Johnson did "not currently work as a first responder at this time," and although she stated that two additional weeks of leave would be beneficial.  (Ex. 58.)  On the same day, Johnson's union attorney wrote to Therres requesting that the City extend Johnson's leave of absence to allow her to attend the retreat.  (Ex. 136.)

In response to Kunzman's November 27, 2007, letter issuing a return to work authorization, Chief of Police David Johnson requested that Kunzman provide a clarifying statement that acknowledged that Plaintiff was able to assume and fulfill the roles of both a Blaine patrol officer and a police detective, both of which included "first responder" duties.  (Ex. 59.)  Kunzman provided Defendant with this authorization on December 1, 2007, stating that Plaintiff could assume full responsibilities as a police detective and police officer with the City of Blaine, with no restrictions or conditions.  (Ex. 61.)

### b)      Fitness for Duty Exam

Plaintiff was instructed to choose one of three doctors to complete the "Readiness for Duty" exam.  (Ex. 64.)  However, Plaintiff's first choice was not available until late January.  (Id.)  Although Plaintiff told Defendant that she did find any of the doctors on the list to be acceptable, Plaintiff consented and was

examined by her second choice, Judy Pendergrass, on December 14, 2007.  (Exs. 64-65; Ex. 137.)

In her January 2008 report, Pendergrass concluded that Plaintiff was prepared to return to duty as a police officer with the Blaine Police Department. (Ex. 65 at 5.)  Pendergrass further concluded, however, that Plaintiff's return to work as a police officer would likely be difficult:

> [I]t will continue to be very difficult for [Plaintiff] to handle stress and sadness in her work.  Though we view her as presently able to handle the scope of the accountabilities associated with the position, we believe that it is probable that she will continue to respond strongly to stress-producing circumstances. . . .
>
> Overall, the demands placed on a police officer are substantial.  Consequently, officers find it necessary to respond to a wide range of circumstances in a prevailing rational and objective fashion.  The readiness with which [Plaintiff] reacts at an emotional level to troublesome circumstances suggests that handling the full scope of accountabilities of the position in a consistently objective, rational, and calm fashion is likely to prove very challenging to her on an ongoing basis during her tenure in the position.  She may well find it advantageous to consider other types of careers that entail less exposure to tension or sadness-producing circumstances on a frequent basis.

(Id.)

Pendergrass recommended that Plaintiff (1) continue her therapeutic relationships with her psychiatrist and her psychologist; (2) continue the

medication that has been prescribed to her; (3) gain skills to use in controlling her temper and reducing her hostility; (4) develop greater personal fortitude and resilience; (5) learn to function with a higher degree of tact in dealing with others; and (6) work with her supervisors to learn more about how to reason her way through issues that are ambiguous in nature.  (Id. at 7–9.)  Pendergrass concluded that "it will be difficult for [Johnson] to undertake and complete successfully the full scope of assignments typically given to a Police Officer if she is unable to reduce considerably her tendency to react at an emotional level." (Id. at 9.)

### c)      The Reentry Agreement

On January 25, 2008, Interim Safety Services Manager/Police Chief Kerry Fenner sent a letter to Plaintiff entitled "Return from Leave of Absence Status – Reentry Agreement."  (Ex. 66.)  The letter indicated that Plaintiff would "return to full and unrestricted patrol duty status, upon [Plaintiff] signing this agreement by the date noted below."  (Id.)  The reentry agreement set forth numerous requirements: 1) Plaintiff was to be assigned to the patrol officer function in order to allow a more structured setting and more interaction with supervisors; 2) Plaintiff was not permitted to engage in any outside employment; 3) Plaintiff

was to follow all of the recommendations detailed in Pendergrass's Psychological

Evaluation; 4) Plaintiff had to continue psychiatric therapy and agree to take all

prescribed medications; 5) Plaintiff was required to develop and submit a plan to

gain skills and tactics to use in controlling her temper and reducing hostility; 6)

Plaintiff could not be the subject of any substantial instances of losing her

temper, expressing hostility, or displaying poor tact or abrasiveness to fellow

City employees, supervisors or the public; 7) Plaintiff could not express criticism

of others' actions and decisions to the affected individual or other employees but

rather must address them with only her designated supervisor; 8) Plaintiff was

required to maintain independence in her work and not solicit or utilize on duty

coworkers to assist her with emotional support in a manner that limited or

restricted the coworker from performing his or her duties and responsibilities,

and, in particular, she was not to contact employees or supervisors after 10:00

p.m.; 9) Plaintiff was required to address issues through objective analysis,

problem solving, and reasoning approaches rather than through emotional or

personal responses; 10) Plaintiff was required to complete a reentry orientation

and training program prior to starting her patrol duties on the "A shift"; 11)

Plaintiff had to meet collectively with two supervisors assigned by the Police

Chief a minimum of one time per month throughout 2008; 12)  Plaintiff could not

have any episodes where she is unable, limited, or hesitant in performing specific

duties assigned to her or required as a police officer because of an emotional

reaction such as crying or because of stress, grief, sadness, or depression; and 13)

Plaintiff had to agree to provide the necessary authorizations and releases for her

psychological treatment records as may be required by the City or Police

Department to determine her continuing psychological health.  (Id.)  The reentry

agreement concluded by stating that a "failure or inability to comply with any of

the stated conditions will result in [Plaintiff's] termination as a Police Officer

with the City."  (Id.)  On January 31, 2008, Plaintiff signed the reentry agreement

and wrote "subject to the grievance filed today by LELS" directly below her

signature.  (Id.)  She then returned to work as a patrol officer, rather than as a

permanent detective.  (Exs. 67, 69.)

### d)     Events During the Duration of the Reentry Agreement

The reentry agreement was in effect from February 6, 2008—the date

Plaintiff returned to work—until March 5, 2009—the date that an arbitrator

decided that the reentry agreement constituted demotion without just cause.

(Exs. 67, 103.)  During the period that the reentry agreement was in effect,

Defendant asserts that Plaintiff violated the agreement on several occasions.

Specifically, on March 2, 2008 Plaintiff left a message on Sergeant Olson's

voicemail explaining the issues she had with Sergeant Sloneker:

> Part of [the reentry agreement] is I have two supervisors that are
> assigned to me, one is Sloneker, and one is you [Sergeant Olson].
> And I will be needing to, let's see, how is it worded, but anyway, I
> got to check in with one of the two, and I choose you, seeing as the
> only problems I'm having at work, believe it or not, are with
> [Sloneker]. . . .  You know, I don't have any problems with co-
> workers, it's all with [Sloneker], you know, do as I say, not as I do
> and he has issues with me because I was talking with Spike about
> my dog past 6:45 in the morning, excuse me?  Yea, whatever, but
> you know Lieutenants aren't going to do anything about him, so
> yea. . . .

 (Ex. 73.)  On March 19, 2008, during a monthly meeting with Sloneker, Plaintiff

"had an outburst that lasted approximately ten minutes.  [Plaintiff] berated and

degraded [] (Sergeant Sloneker) during this time . . . was insubordinate and very

unprofessional."  (Ex. 100.)  On September 26, 2008, Plaintiff had a verbal

exchange and outburst in the police department's mailbox area in which she

stated that the Human Resource Director Terry Dussault was a "mother f*cking

piece of sh*t."  (Exs. 97, 98; Johnson Dep. 233.)

    On February 17, 2008, Plaintiff wrote an email to Fenner requesting that

she be removed from the overtime list.  In the email Plaintiff stated:

> Can my name be removed from the overtime list?  I don't want any circumstances or problems where I am forced to work and then miss parts of my continuing psychiatric treatments/groups.  I have group/treatment on Tuesdays at 5pm, Wednesdays at 6pm, Thursdays at 4, 5 or 6p, and every other Saturday at 4pm.
>
> Please don't read this as me being difficult.  I just thought I would ask.  With my luck, I know it will become an issue sooner or later and would rather avoid problems with the Sgts or with missing group/treatments.  I never worked much overtime anyway.

(Ex. 142.)  On February 25, Fenner denied Plaintiff's request to be removed from the regular overtime list.  (Ex. 143.)  Fenner explained that the Regular Overtime List, as opposed to the Reimbursable Police Overtime list, was "mandatory for all nonexempt sworn personnel as a way of distributing overtime as fairly as possible pursuant to . . . the labor agreement between [LELS] and the City of Blaine.  Further the City of Blaine Position Description for Police Officer lists 'Extended Day' under environmental factors for the job."  (Id.)  He stated, "All of our police officers are responsible for meeting all duties, responsibilities and requirements of the position description therefore I am not going to allow you to be removed from the 'Regular Overtime List.'"  (Id.)

In September 2008, Plaintiff requested permission to take on a second job during her off-duty hours in order to "maintain financial wellness" based on her divorce and pay cut by the City.  (Ex. 140.)  Defendant denied this request

14

pursuant to its authority under the reentry agreement, but reminded Plaintiff

that she was able to work reimbursable overtime to address her financial

wellness.  (Ex. 141.)

### e)   2008 Promotional Process

In June 2008, Defendant conducted an internal promotional process for

two sergeant positions and twelve candidates applied, including Plaintiff.  (Exs.

81, 83.)  Defendant contracted with Campion, Barrow & Associates ("Campion")

to develop and administer the written portion of the testing.  (Exs. 81, 84.)  The

testing process included both an oral and a written exam.  (Ex. 81.)  The oral

board examination included an interview by a panel of three external law

enforcement officials.  (Ex. 83.)

After Campion administered the written test, a candidate complained

about the questions contained in the sergeant leader interview form.  (Johnson

Dep. 303; Ex. 3, Dussault Dep. 65-70.)  The written test included a peer

assessment form which indicated that the reviewer should "put an **X** at the point

where the *ideal successful female candidate applying for the position operates*

and a circle (**0**) where you *__believe the above stated individual operates__*."  (Ex. 149

(emphasis in original).)  The peer assessment form also asked, among other

15

things, whether the applicant had a "good height weight ratio" and whether the

candidate had a "Full and satisfying personal life with good family relationships

and outside activities." (Id.)  A form that the candidate had to fill out asked,

among other things, questions regarding whether the candidate had children,

had gained weight recently, and was married, separated, divorced, widowed, or

living with a boyfriend/girlfriend.  (Id.)

After complaints regarding the questions were brought to the City's

attention, the City decided to omit consideration of the written testing until after

making a conditional offer and to make the oral board interview count for 100

percent of a candidate's score; at no time would the City have access to the

written test materials.  (Dussault Dep. 61-70; Johnson Dep. 303; Ex. 82.)  The City

determined that it did not have the time and resources to conduct an entirely

new testing process.  (Dussault Dep. 67)

Three men – a captain from White Bear Lake, a deputy chief from

Champlin, and a lieutenant from Brooklyn Park – interviewed the candidates.

(Exs. 83.)  Lt. Pelkey and Human Resources Coordinator Sheri Chesness

observed the interviews.  (Id.)  Most of the questions were designed to elicit

responses about the candidates' leadership and supervisory skills.  (Ex. 86.)

During Plaintiff's July 30, 2008 interview, she stared down Pelkey and stated that the City's police supervisors did not "have the balls" to tell the public something. (See, e.g., Exs. 88 (response to question 10), 100.)

The City selected the top five candidates for an interview with Interim City Chief Olson and Captain Fenner.  Plaintiff was ranked eleventh.  (Ex. 88.)  In August 2008, the City promoted two male police offers.  Before the final interview, one of the men had ranked first in the process and one had ranked fourth.  (Exs. 88-90.)  Plaintiff points out that neither man had ever been a permanent detective, and both had only two-year degrees.  (Exs. 89-90.)  Plaintiff had been with the Blaine Police Department longer than either man.  (Id.)  Both men had received very positive performance evaluations and numerous commendations and had additional expertise.  (Id.)  Neither had ever been disciplined by the City.

At the time, the Department had approximately 60 sworn officers and approximately 5 of these were women.  (Ex. 6; Ex. 2, Olson Dep. 35, 55.)  All of the supervisory officers are male.  (Olson Dep. 60.)

### f)        The Arbitrator's Decision

On March 5, 2009, the arbitrator issued her determination regarding

Plaintiff's reentry agreement grievance.  The arbitrator sustained Plaintiff's

grievance and concluded that "[t]he City violated the contract [collective

bargaining agreement] when it required [Plaintiff] to sign a reentry agreement

that placed her in a Patrol Officer position."  (Ex. 103 at 12.)  The determination

went on to find:

> [Plaintiff] was denied her previous position as detective.  She
> suffered a serious reduction in pay.  She was denied other
> assignments she had successfully performed previously.  The
> reentry agreement was incredibly detailed, onerous and petty in its
> requirements for reporting and compliance.  It contained
> prohibitions about expressing or communicating with co-workers,
> which were not placed on other officers.  All of these consequences
> are disciplinary in nature.  Violation of the agreement was to result
> in [Plaintiff's] termination.  That is a disciplinary consequence.

(Id. at 10-11 (footnote omitted).)  The arbitrator  concluded that Plaintiff "should

return to her position as detective and restored to her assignments as FTO, Use of

Force Instructor, and to her entitlement for on-call benefits, as well as her back

wages and benefits up to the date of this decision."  (Id.)  On March 6, 2009, the

City reinstated Plaintiff to the position of detective and awarded her back pay;

the requirements of the reentry agreement were removed, with the exception of

the requirement that she continue therapy and take all prescribed medications.

(Exs. 104-105.)

### 5.    Plaintiff's Employment from 2009 to Resignation

In June 2009, Defendant received several complaints of Plaintiff engaging

in misconduct, insubordination, and/or harassment of supervisors and co-

workers.  (Exs. 107–112.)  Specifically, on June 5, 2009, Defendant received a

complaint that Plaintiff had approached Sergeant Brian Owens and called him a

"spineless dick-less bastard," said "Your slithering ways are bulls*t and you

better not ever do that again are we clear," and made other inappropriate

comments while yelling inches from his face.  (Exs. 107–09.)  Plaintiff admitted

calling him a "dickless wonder," while leaning over him, "in his face."  (Ex. 109.)

Also in June 2009, Defendant received a complaint from the police chief's

administrative assistant that in December 2008, Plaintiff had threatened to harm

or kill the assistant's spouse and dog.  (Exs. 110–11.)  Specifically—according to

the assistant—in December of 2008, Plaintiff was complaining about Blaine Police

Department's administration and said to the assistant: "Oh that's right, you're

part of Administration.  If you tell Administration what I said, I will get your

husband and kill your dog."  (Ex. 111; <u>see also</u> Johnson Dep. 81-83 (claiming she

told the assistant that she "would come and get [her] husband and get [her]

dog").) Effective June 29, 2009, Defendant placed Plaintiff on paid administrative

leave while the assistant's allegations were investigated for potential criminal

conduct by the Maple Grove Police Department. (Sullivan Aff., Exs. 110, 111.)

When a police officer is on paid administrative leave, she must be available to

work, may use vacation or sick time, and is not authorized to act as a police

officer. (Ex. 110.)

 While on paid administrative leave Plaintiff began experiencing severe

depression and was admitted to Abbot Northwestern Hospital on July 11, 2009.

(Exs. 5, 114.) She was stabilized and released on July 15, 2009. (Id.) Plaintiff had

multiple stays at the hospital between July 16, 2009 and November 9, 2009. (Id.)

 On July 29, while on paid administrative leave, Plaintiff informed

Defendant that she was "incapacitated" in the hospital for mental illness and

participating in a six month treatment program. (Exs. 113-114.) She submitted

an FMLA leave request on July 29, 2009, but requested that her FMLA leave

begin after her paid administrative leave ended. (Ex. 114.) However, Plaintiff's

health care provider indicated that the approximate date that Plaintiff's condition

commenced was July 12, 2009.  (Ex. 114.)  For this reason, Defendant designated

July 12, 2009 as the start of Plaintiff's FMLA leave.  (Ex. 115.)

Defendant sent a letter to Plaintiff on October 30, 2009, explaining that she

had exhausted her FMLA as of October 3, 2009.  (Ex. 118.)  Defendant further

informed Plaintiff that she owed Defendant payments for her employment

benefits for the month of October, and that she was required to provide a fitness

for duty certificate or request an unpaid leave of absence in writing by

November 13, 2009, or she would be deemed to have abandoned her job.  (Id.)

On November 17, 2009, Plaintiff's doctor submitted a note stating that she was

able to return to work without restrictions.  (Ex. 121.)

Plaintiff then underwent a "Readiness-for-Duty" exam by licensed

psychologist John Fennig, which included psychological testing, an interview

with Plaintiff, interviews with Plaintiff's coworkers and others, and a review of

documents.  (Ex. 123.)  In his January 2010 report, Fennig concluded that Plaintiff

"show[ed] no signs of mental health issues today," but that she was still not able

to "safely and effectively" perform her police duties because of her "behavioral

issues."  (Id. at 2.)  The report stated:  "[Plaintiff's] return to work in the City of

Blaine – given both her derailing behavior and the scope and scale of current

21

stressors from the criminal charges, workplace investigations, grievances and other actions – will continue to provoke the worst behavior in [Plaintiff] and potentially destabilize her psychological health."  (Id. at 5.)

On November 12, 2009, the Maple Grove prosecutor criminally charged Plaintiff with disorderly conduct for her threats to the assistant.  (Ex. 120.)  On January 21, 2010, before Defendant took any action with regard to Fennig's report or completed its employment investigation regarding her alleged criminal conduct, Plaintiff resigned.  (Ex. 124.)  After Plaintiff's resignation, Defendant concluded its investigation and determined that Plaintiff had engaged in misconduct that warranted discipline.  (Ex. 127.)

On January 25, 2010, Plaintiff entered into a plea agreement in the criminal matter under which the prosecutor agreed to suspend prosecution and dismiss the charges after one year if Plaintiff had no contact with the victim except as required by employment, did not commit assault, harassment, or disorderly conduct, and complied with the recommendations of her therapist and signed a medical release so that the prosecutor could verify compliance.  (Exs. 125-126.)

Plaintiff subsequently was granted total disability benefits through the Public Employees Retirement Association ("PERA").  (Johnson Dep. 281-82.)  She

admits that she is not capable of working as a police officer or working full time

at any job.  (Id. 285-87.)  Between January 2010 and February 2013, Plaintiff was

hospitalized at least twelve times.  (Ex. 5.)

### B.     Procedural Background

Plaintiff filed two discrimination charges against Defendant with the

EEOC.  The first charge was sworn on October 30, 2008 and alleged

discrimination based on sex, retaliation, disability, and failure to accommodate

beginning in November 2007.  (Ex. 151)  The second charge was sworn on

December 8, 2009 and alleged discrimination based on sex, retaliation, disability,

and failure to accommodate beginning in November 2007.  (Ex. 152.)

Johnson filed a Complaint in this Court against the City of Blaine on

February 21, 2012.  She alleges: Count One: Disability Discrimination in Violation

of the Americans with Disabilities Act ("ADA"); Count Two: Disability

Discrimination in Violation of the Minnesota Human Rights Act ("MHRA");

Count Three: Failure to Accommodate in Violation of the ADA; Count Four:

Failure to Accommodate in Violation of the MHRA; Count Five: Sex

Discrimination in Violation of Title VII; Count Six: Sex Discrimination in

Violation of the MHRA; Count Seven: Retaliation in Violation of the ADA; Count

Eight: Retaliation in Violation of Title VII; Count Nine: Reprisal in Violation of

MHRA; Count Ten: Interference with FMLA Rights; and Count Eleven:

Retaliation in Violation of the FMLA.

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no dispute issue of

material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

### B.   Plaintiff's ADA and MHRA Disability Discrimination Claims

### 1.   Standard for Disability Discrimination Claim

Pursuant to the ADA, an employer may not "discriminate against a

qualified individual on the basis of disability in regard to job application

procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of

employment." 42 U.S.C. § 12112(a). Plaintiff also asserts a disability

discrimination claim under the MHRA. Both ADA and MHRA claims are

analyzed under the McDonnell Douglas burden-shifting analysis.

Dovenmuehler v. St. Could Hosp., 509 F.3d 435, 439 n.4 (8th Cir. 2007). "A

plaintiff seeking relief under the ADA must show (1) he is a disabled person as

defined by the ADA, (2) he is qualified to perform the essential functions of his

job with or without reasonable accommodation, and (3) he suffered an adverse

employment action because of his disability." St. Martin v. City of St. Paul, 680

F.3d 1027, 1032 (8th Cir. 2012) (citation omitted). "The burden then shifts to the

employer to articulate some legitimate, nondiscriminatory reason for the

employer's actions. If the employer articulates such a reason, the burden returns

to the employee to show the employer's justification is a pretext." Lors v. Dean,

595 F.3d 831, 834 (8th Cir. 2010) (citations omitted).

## 2. Analysis

### a) Prima Facie Case

#### (1) Disability

Neither party disputes that Plaintiff is disabled within the meaning of the

ADA and MHRA.

### (2)    Qualified to Perform Essential Job Functions

The next step in the prima facie case is whether Plaintiff was qualified to perform the essential functions of her job.  "The determination of qualification takes two parts: (1) whether the individual meets the necessary prerequisites for the job, such as education, experience, training, and the like; and (2) whether the individual can perform the essential job functions, with or without reasonable accommodation."  Benson v. Nw. Airlines, Inc., 62 F.3d 1108, 1111–12 (8th Cir. 1995).

Here, Plaintiff possessed the necessary prerequisites for the job, such as education, experience and training.  However, she could not safely perform the essential functions of her job with or without reasonable accommodation.

Plaintiff's ADA and MHRA claims cannot survive because she posed a direct threat to the health or safety to herself or others in the workplace.  42 U.S.C. § 12113(b); Minn. Stat. § 363A.25; 29 C.F.R. § 1630.15(b)(2).  A direct threat is a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated by reasonable accommodations.  29 C.F.R. § 1630.2(r).  The direct threat defense is an affirmative defense for which the employer bears the burden of proof.  EEOC v. Wal-Mart Stores, Inc., 477 F.3d 561, 571–72 (8th Cir. 2007).

> The Supreme Court requires an individualized direct threat analysis that relies on the best current medical or other objective evidence in order to protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear. Specific factors to be considered include (1) the duration of risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm.

Id. at 571 (citations omitted).  Here, the Court is not bound by the arbitrator's 2009 decision, which did not address the question of direct threat, disability, or reasonable accommodation.  Nor did the arbitrator's decision address the 2010 Fitness for Duty Report.

In the 2010 Fitness for Duty Report, Fennig found that Plaintiff could not function "safely and effectively" in the police department.  (Ex. 123 at 2.) Specifically, the Report states:

> Though [Plaintiff] can be considered mentally healthy at present, she does have a major issue preventing her from functioning safely and effectively as a law enforcement officer for the City of Blaine today. She engages in behaviors that derail her, significantly decrease her effectiveness, and put her in difficult positions with those with who she is working.  For [Plaintiff], anger management, reactivity to situations that trigger her to say the wrong things in the wrong way, and difficulty following orders in a chain of command are derailing behaviors.  These fall within the arena of 'problems with interpersonal relationships' which are well understood and documented derailers in work psychology literature and the news. This prevents [Plaintiff] from functioning safely and effectively in the City of Blaine Police Department.

27

(Id. (footnote omitted)).

Based on the 2010 Fitness for Duty Report, issued by an objective medical professional after a thorough and individualized assessment, Johnson was a direct threat to the safety of herself and others.  Additionally, it is undisputed that Johnson had an extensive history of suicide ideation, and her position required her to be armed with a firearm.

The Eighth Circuit has explained:

> [T]he risk of an armed patrol officer being unable to function in an emergency situation is not a risk we are prepared to force a police department to accept.  The inherent and substantial risk of serious harm arising from such episodes, given the nature of police work, is self-evident.

Burroughs v. City of Springfield, 163 F.3d 505, 508 (8th Cir. 1998).

The cases upon which Plaintiff relies do not support a denial of summary judgment in this case, where Defendant's assessment of the threat posed by Plaintiff in the position of armed police officer was based on an individualized psychological assessment.  For example, in McKenzie v. Dovala, the court found a fact issue remained on the question of direct threat because the law enforcement agency could have placed the applicant, who had a mental illness and had previously attempted suicide, into a position that did not require the use

28

of force and because the individual was not given an individualized

psychological assessment.  242 F.3d 967, 975-76 (10th Cir. 2001).  Here, Johnson

only sought continued employment as an armed police officer, and the City

relied upon an individualized and extensive psychological assessment of

Johnson to conclude that she posed a direct threat.  Similarly, in <u>Stillwell v.</u>

<u>Kansas City, Missouri Board of Police Commissioners</u>, the court held that a

blanket prohibition on granting armed security guard licenses to applicants with

only one hand was illegal because the department was required to give each one-

handed applicant a "case-by-case" consideration and "[t]he appropriate inquiry

by the Board must be limited to whether or not an applicant can perform the

duties of a police officer, not whether the applicant has two hands."  872 F. Supp.

682, 687 (W.D. Mo. 1995).  Here, Defendant had no such blanket rule and did

conduct an individualized analysis of the threat to safety posed by Plaintiff.

### (3)    Adverse Employment Action Due to Disability

Plaintiff alleges that Defendant constructively discharged her from Blaine

Police Department.

> Constructive discharge occurs when an employer deliberately
> renders the employee's working conditions intolerable, thereby
> forcing [him] to quit.  To prove a case of constructive discharge, a
> plaintiff must show (1) a reasonable person in his situation would

find the working conditions intolerable, and (2) the employer
intended to force him to quit.  A plaintiff may meet the second
element by showing his resignation was a reasonably foreseeable
consequence of [his employer's] discriminatory actions.

Carpenter v. Con-Way Cent. Express, Inc., 481 F.3d 611, 616-17 (8th Cir. 2007)

(citations omitted).

The Court concludes that there is no evidence that, leading up to and at the

time Johnson resigned, the City deliberately rendered her working conditions

intolerable, forcing her to quit.  Rather, there was a substantiated report that she

threatened another City employee's spouse and dog.  Johnson, herself, admits

the substance of the allegations.  And the City put her on paid leave while that

allegation was investigated by an outside law enforcement agency.  While on

paid leave, it is undisputed that Plaintiff became unable to perform her job due

to mental health issues and long-term hospitalizations, so she was placed on

FMLA leave.  The City then ordered her to undergo a fitness for duty exam

before returning, which is standard procedure, and the independent examiner

found that she was not fit for duty.  None of these actions by the City qualify as

deliberately rendering Johnson's working conditions intolerable in the six

months leading up to her resignation.

To the extent that Johnson asserts that the 2008 reentry agreement and demotion were part of a pattern of harassment leading up to a constructive discharge, the Court notes that those actions were remedied with elimination of the reentry agreement requirements save medication and continued therapy, reinstatement to the position of detective, and the award of back pay as of March 6, 2009, ten months before Johnson resigned.  There is insufficient evidence to allow a reasonable jury to find constructive discharge in January 2010.

### b)      Conclusion

Because the Court holds that Plaintiff cannot raise meet the prima facie case, the Court need not reach the question of whether Plaintiff can show pretext. Defendant is entitled to summary judgment on Plaintiff's disability discrimination claims.

### C.      Plaintiff's ADA and MHRA Failure to Accommodate Claims

### 1.      Standard for ADA and MHRA Failure to Accommodate Claims

In a failure to accommodate case, "the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations." Peebles v. Potter, 354 F.3d 761, 767 (8th Cir. 2004).

> [I]t is not the employer's discriminatory intent in taking adverse employment action against a disabled individual that matters. Rather, discrimination occurs when the employer fails to abide by a legally imposed duty. The known disability triggers the duty to reasonably accommodate and, if the employer fails to fulfill that duty, we do not care if he was motivated by the disability.

Id. (citations omitted).

The Court applies a modified burden-shifting analysis to reasonable accommodation claims. Fenney v. Dakota, Minn. & E. R.R. Co., 327 F.3d 707, 712 (8th Cir. 2003). A plaintiff must make a facial showing that she has an ADA disability, that she suffered an adverse employment action, and that she is a "qualified individual," with or without reasonable accommodation. Id.

> Where the employee requests accommodation, the employer must engage in an informal, interactive process with the employee to identify the limitations caused by the disability and the potential reasonable accommodations to overcome those limitations. An employer hinders this process when: the employer knows about the employee's disability; the employee requests accommodations or assistance; the employer does not in good faith assist the employee in seeking accommodations; and the employee could have been reasonably accommodated but for the employer's lack of good faith.

Battle v. United Parcel Serv., Inc., 438 F.3d 856, 862–63 (8th Cir. 2006) (citations omitted).

The plaintiff need only "make a facial showing that a reasonable accommodation is possible." Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944,

950 (8th Cir. 1999).  The burden of production then shifts to the defendant "to

show that it is unable to accommodate."  Id.  "There is no precise test for what

constitutes a reasonable accommodation, but an accommodation is unreasonable

if it requires the employer to eliminate an essential function of the job."  EEOC v.

Convergys Customer Mgmt. Group, Inc., 491 F.3d 790, 796 (8th Cir. 2007)

(citations omitted).

### 2. Discussion

To the extent that Johnson's claims are based on the City's refusal, in the

fall of 2007, to extend her leave after her FMLA leave had been exhausted to

permit her to attend a West Coast Post-Trauma Retreat in December 2007, the

claims fail.  Because the fitness for duty exam could not be completed until

January 2008, Johnson was, in fact, granted leave until February 2008.  Moreover,

Plaintiff's FMLA leave had been exhausted and the City was not obligated to

provide an indefinite leave of absence.  "[R]egular attendance at work is an

essential function of employment.  While allowing a medical leave of absence

might, in some circumstances, be a reasonable accommodation, [a]n employer is

not required by the ADA . . . to provide an unlimited absentee policy."  Brannon

v. Luco Mop Co., 521 F.3d 843, 849 (8th Cir. 2008) (citations omitted).  Finally, the

33

City did permit Plaintiff to attend a West Coast Post-Trauma Retreat in February 2008.  (Exs. 70-72.)

The Court also dismisses Johnson's claims to the extent that they are based on the City's failure to remove her from the mandatory overtime list so that she could go to her group therapy and treatment appoints at regular times.  Working overtime was a job duty for all officers, contained in the job description and the collective bargaining agreement, and Johnson could request leave if she needed to go to a particular appointment.  Johnson does not point to any particular appointment that she was forced to miss or treatment that was impacted, and "[t]he employer is not obligated to provide the accommodation requested or preferred by the employee."  Cravens v. Blue Cross & Blue Shield, 214 F.3d 1011, 1019 (8th Cir. 2000).  Additionally, mandatory overtime was an essential part of the patrol officer position, and "an accommodation is unreasonable if it requires the employer to eliminate an essential function of the job."  Convergys Customer Mgmt. Group, Inc., 491 F.3d at 796.

Plaintiff also objects that Defendant violated the ADA and MHRA by requiring her to be completely free of any restrictions in order for her to return to work.  During the fall of 2007, as the City and Plaintiff were communicating

regarding the possible extension of Plaintiff's leave, the City stated that, before

Plaintiff could return to work, she must provide a letter from her doctor stating

that she could fulfill her job duties and responsibilities "with no restrictions or

conditions."  (See, e.g., Ex. 53, Oct. 26, 2007 Letter at 2; Ex. 59, Nov. 28, 2007

Letter at 2.)  On December 1, 2007, Plaintiff's doctor did provide such a letter.

(Ex. 61.)  While an employer may not issue a blanket refusal to accommodate an

employee, this record does not support a failure to accommodate claim.  Here,

apart from the requests for extended leave during December 2007 through

January 2008, the request to attend to trauma retreat, and the request to be

removed from the mandatory overtime list, all which the Court has addressed

above, Plaintiff can point to no particular accommodation that the City should

have made, but did not make, for her.

The Court grants summary judgment for Defendant on Plaintiff's failure to

accommodate claims.

### D.    FMLA Claims

The FMLA provides eligible employees up to 12 weeks of unpaid leave

during any 12-month period if, among other things, they have a serious health

condition that makes them unable to perform the functions of their position.  29

U.S.C. § 2612(a)(1)(D).

> Two types of claims exist under the FMLA: (1) 'interference' or
> '(a)(1)' claims in which the employee alleges that an employer
> denied or interfered with his substantive rights under the FMLA
> and (2) 'retaliation' or '(a)(2)' claims in which the employee alleges
> that the employer discriminated against him for exercising his
> FMLA rights.

Stallings v. Hussmann Corp., 447 F.3d 1041, 1050 (8th Cir. 2006) (citing 29 U.S.C.

§ 2615(a)(1)-(2)).  "The difference between the two claims is that the interference

claim merely requires proof that the employer denied the employee his

entitlements under the FMLA, while the retaliation claim requires proof of

retaliatory intent."  Id. at 1051.  "Although in some circumstances, a given set of

facts will fall clearly into either (a)(1) or (a)(2), it appears that the lines between

the two categories are not hard and fast."  Id. (citation omitted).

### 1.      Standard for Interference

An employer is prohibited from interfering with restraining,
or denying an employee's exercise of or attempted exercise of any
right contained in the FMLA.  Interference includes not only
refusing to authorize FMLA, but discouraging an employee from
using such leave.  It would also include manipulation by a covered
employer to avoid responsibilities under FMLA.  An employer's
action that deters an employee from participating in protected
activities constitutes an "interference" or "restraint" of the
employee's exercise of his rights. . . . When an employer attaches
negative consequences to the exercise of protected rights, it has
"chilled" the employee's willingness to exercise those rights because
he or she does not want to be fired or disciplined for doing so.

Stallings, 447 F.3d at 1050 (citations omitted).

"In an interference claim, an employee must show only that he or she was

entitled to the benefit denied."  Stallings, 447 F.3d at 1050 (citation omitted).

However, "where an employer's reason for dismissal is insufficiently related to

FMLA leave, the reason will not support the employee's recovery," because

"strict liability does not apply."  Id. at 1051 (citation omitted).

### 2.      Standard for Retaliation

> The FMLA prohibits employers from discriminating against
> an employee for asserting his rights under the Act.  This prohibition
> necessarily includes consideration of an employee's use of FMLA
> leave as a negative factor in an employment action.  Basing an
> adverse employment action on an employee's use of leave . . . is
> therefore actionable.

Stallings, 447 F.3d at 1051 (citations omitted).

> An employee can prove Leave Act retaliation circumstantially, using
> a variant of the McDonnell Douglas method of proof.  To establish a
> prima facie case of retaliation, [Johnson] must show that she
> exercised rights afforded by the Act, that she suffered an adverse
> employment action, and that there was a causal connection between
> her exercise of rights and the adverse employment action.

Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir. 2002) (citation and

footnote omitted).  "If the employer comes forward with evidence of a legitimate,

nondiscriminatory reason for its treatment of the employee, the employee must

then point to some evidence that the employer's proffered reason is pretextual."
Id. at 833.

### 3.   Discussion

The Court grants summary judgment for Defendant on Plaintiff's FMLA

claims.  Plaintiff bases her claims on the City's decision to place her on FMLA

leave on July 12, 2009, after she had already been placed on paid administrative

leave starting June 29, 2009 in light of the criminal investigation into her threat to

another City employee.  There is no case law to support Plaintiff's claim that an

employer must allow an employee to take paid administrative leave when she is

unable to perform her job due to a serious health condition.  As the Eighth

Circuit noted in Chubb v. City of Omaha, "[t]he FMLA does not require

employers to provide paid leave."  424 F.3d 831, 833 (8th Cir. 2005).  See also 29

U.S.C. §§ 2612(c), (d)(2)(B).

Plaintiff was hospitalized for a substantial portion of the period July 11,

2009 to November 9, 2009.  (Ex. 5.)  She notified the City that she was

"incapacitated."  (Exs. 112-114.)  It is undisputed that Plaintiff was unable to

work due to her health condition as of July 12, 2009, the date that her health care

provider indicated her condition, which qualified her for FMLA leave, began.  At

no time after July 2009 did Johnson successfully complete a fitness for duty exam that would have allowed her to return to work.

Plaintiff points to no statute, City policy, or union contract provision that requires the City to provide paid administrative leave when an employee is unable to work.  Under City policy, while on paid administrative leave, an employee must be available for work; the employee may use sick time or vacation time if she is unavailable.  This policy is logical; otherwise, an employee under investigation for misconduct would be placed in a better position than an employee not under investigation because she could go on vacation and receive full pay while not using vacation time.  Here, Plaintiff was not available for work as of July 12, 2009.  There is no evidence that Plaintiff was entitled to paid administrative leave.

Finally, Johnson does not point to evidence to support an FMLA retaliation claim.  Johnson does not appear to allege FMLA retaliation based on her demotion and reentry agreement after her 2007 FMLA leave; in any case, such a claim would be barred by the 3-year statute of limitations for FMLA claims.  See 29 U.S.C. § 2617(c)(1)(2); 29 C.F.R. § 825.400(b).  Regarding the City's actions following Plaintiff's 2009 FMLA leave, as the Court explained in its discussion of

Plaintiff's disability discrimination claims, no constructive discharge occurred. There is no evidence of any adverse employment action taken by the City after Plaintiff's 2009 FMLA leave.

### E.  Sex Discrimination

Johnson asserts that the City engaged in sex discrimination when it failed to promote her to sergeant in 2008.  Both the MHRA and Title VII prohibit an employer from discriminating against an employee because of her sex.  See 42 U.S.C. § 2000e-2; Minn. Stat. § 363A.08.  The Court applies the same analysis to both MHRA and Title VII claims.  Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011).

### 1.  Direct Evidence Analysis

The Court concludes that Plaintiff has not pointed to direct evidence of discrimination.  Johnson claims that the application materials for the sergeant position constitute direct evidence of sex discrimination.  Defendant did not create the written materials and, when the inappropriate questions were brought to Defendant's attention, it omitted the written materials from consideration in the rankings.  There is no evidence of remarks or actions by a decision maker that evidence sex discrimination.

### 2.      Indirect Evidence Analysis

When there is no direct evidence of discriminatory motive, the Court

applies the <u>McDonnell Douglas</u> analysis to the plaintiff's claim.  <u>Jackson v.</u>

<u>United Parcel Serv., Inc.</u>, 643 F.3d 1081, 1086 (8th Cir. 2011).

> To establish a prima facie case of race or sex discrimination in a
> failure-to-promote claim, a plaintiff must show that: (1) she is a
> member of a protected group; (2) she was qualified and applied for a
> promotion to an available position; (3) she was rejected; and (4)
> similarly situated employees, not part of the protected group, were
> promoted instead.

<u>Id.</u> (citation omitted).

"[T]he defendant may rebut the prima facie case by articulating a non-

discriminatory rationale for its action.  [Then], the plaintiff must prove that the

defendant's proffered rationale was merely pretext for discrimination."  <u>Id.</u>

(citations omitted).

### a)      Prima Facie Case

At this stage, Defendant admits that Plaintiff meets the prima facie case.

### b)      Legitimate Non-discrimination Reason

The City articulated a non-discriminatory rationale for its action.  It claims

that it promoted the two successful male candidates because of their superior

qualifications and performance in the hiring process.  In contrast, Plaintiff

41

performed poorly and did not demonstrate leadership ability during the hiring

process, such as when, during the interview, she said that the police supervisors

did "not have [] balls."

c)      Pretext

Plaintiff cannot show pretext.  First, Plaintiff has failed to point to any

other employee who made similarly inappropriate comments during the

interview process.  Although, as Plaintiff points out, she had worked for the

City's police department longer than the two men who were promoted, had a

more advanced degree, and had previously been a detective, she also had been

disciplined.  Neither promoted officer had ever been disciplined, and only a two-

year degree was required for the promotion.

Second, Plaintiff cannot show that the City's proffered explanation is

unworthy of credence or that a prohibited reason more likely motivated the City.

There is no evidence of gender bias, other than the circumstantial fact that the

interview panel consisted of men and the two officers promoted were men.

Although the rankings for the top five candidates were based entirely on the

interview process, the fact that a subjective interview process was used is not

enough, alone, to create a fact question for a jury.  The fact that an employer uses

an interview process for an employment decision is not evidence of

discrimination merely because it is subjective.  See, e.g., Torgerson v. City of

Rochester, 643 F.3d 1031, 1050 (8th Cir. 2011).  This is particularly true when the

interviews include uniform questions and a scoring matrix.  Additionally, here,

outside police supervisors were used to conduct and score the interviews.  All

three outside interviewers gave Plaintiff a similarly low score.  Moreover, it is

undisputed that Johnson admittedly stated during the interview that the City's

police supervisors did not "have [] balls," resulting in a poor score on that

question.  There is no indication that any other candidate made a similarly

improper comment during the interview process.

The Court grants summary judgment to the City on Johnson's sex

discrimination claims.

### F.    Retaliation

Johnson claims that the City unlawfully retaliated against her in violation

of Title VII, the ADA, and the MHRA.  See 42 U.S.C. §§ 12203(a), 2000e-3; Minn.

Stat. § 363A.15.  The McDonnell Douglas burden-shifting framework applies to

ADA, Title VII, and MHRA retaliation claims.  Stewart v. Indep. Sch. Dist. No.

196, 481 F.3d 1034, 1042-43 (8th Cir. 2007) (ADA, Title VII); Hoover v. Norwest

Private Mortg. Banking, 632 N.W.2d 534, 548 (Minn. 2001) (MHRA).

> [T]he initial burden is on the plaintiff to establish a prima facie case, consisting of evidence: (1) that he or she engaged in statutorily protected activity; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events.  If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to show a non retaliatory reason for the adverse employment action.  If the defendant can show a legitimate, non-retaliatory reason for its actions, the burden returns to the plaintiff who is then obliged to present evidence that (1) creates a question of fact as to whether [defendant's] reason was pretextual and (2) creates a reasonable inference that [defendant] acted in retaliation.

Stewart, 481 F.3d at 1043 (citations omitted).

### 1.    Prima Facie Case

Johnson asserts that she engaged in protected conduct when she filed charges for violations of Title VII, the ADA, and the MHRA.  See 42 U.S.C. § 12203; Minn. Stat. § 363A.15; Sutherland v. Mo. Dept. of Corrections, 580 F.3d 748, 752 (8th Cir. 2009).  She also argues that she engaged in protected conduct when she requested reasonable accommodations for her disability, such as permission to attend the trauma retreat.

Johnson further claims that Defendant took adverse action against her such as demoting her, denying her a promotion, forcing her onto paid administrative leave, changing the paid administrative leave to unpaid FMLA

leave, disciplining her, referring her for criminal charges, and constructively

discharging her.

Assuming, without deciding, that Plaintiff could establish a prima facie

case, the Court holds that she is unable to show pretext.

### 2.    Pretext

Defendant points out that, to show pretext, an employee must establish

more than a temporal connection between the protected conduct and the adverse

employment action.  Barber v. C1 Truck Driver Training, LLC, 656 F.3d 782, 802

n.10 (8th Cir. 2011).  Evidence that the employer was concerned about the

employee issue before the employee engaged in protected activity undermines

the significance of temporal proximity.  See Hervey v. County of Koochiching,

527 F.3d 711, 723 (8th Cir. 2008).

As previously addressed with regard to Plaintiff's sex discrimination

claim, there is no evidence that the City's failure to promote Johnson to sergeant

was pretextual.  She performed poorly in the interview, as scored by three

disinterested interviewers, and made a highly inappropriate comment during the

interview.

As discussed with regard to Plaintiff's FMLA claim, Defendant's act of changing Johnson's paid administrative leave to unpaid FMLA leave was legally justified and not pretextual.

Johnson provides no specific evidence to support her allegation of unwarranted discipline. She does not dispute leaning over Sergeant Owens and, inches from his face, calling him an offensive and insubordinate name in June 2009. She admits the substance of the threat that she made to the police chief's administrative assistant, which was confirmed by an outside agency investigation. She cannot show that the discipline was pretextual.

Nor can Johnson show that the referral for criminal charges or placement on paid administrative leave was retaliatory. The City placed Johnson on paid administrative leave while the Maple Grove Police Department investigated the potential criminal conduct of her threat to an assistant. There is no dispute that, in June 2009, the City learned of the assistant's complaint of the threat by Johnson. Johnson admits that the incident occurred substantially as alleged. The outside agency found probable cause to issue a criminal complaint against Johnson for the incident. Defendant did not cut Johnson's pay or benefits, but removed her from the work environment, in which the complaining assistant

worked, until the investigation was complete.  There is no indication that this was an unreasonable or pretextual action.

As the Court explained with regard to the disability claims, the record cannot support an assertion of constructive discharge.

Finally, to the extent that Johnson relies on the City's demotion of Johnson to patrol officer as part of the 2008 reentry agreement, the demotion could not have been retaliation for filing EEOC charges because both charges were filed after that date.  The only accommodation for a disability that Plaintiff requested before the 2008 reentry agreement was implemented was her request for extended leave beyond her FMLA leave and beyond the month-and-a-half of additional leave that the City had agreed to grant her in 2007.  As previously discussed, the City had no obligation to provide the requested extended leave. However, in fact, the City did end up keeping Plaintiff on leave through January 2008, as she had originally requested, and did allow her to attend the trauma retreat February 2008, so there is simply no causal connection.

Accordingly, based upon the files, records, and proceedings herein**, IT IS HEREBY ORDERED**:

Defendant's Motion for Summary Judgment [Docket No. 11] is **GRANTED**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:   August 26, 2013                    s/ Michael J. Davis
                                            Michael J. Davis
                                            Chief Judge
                                            United States District Court